UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID MCCAUSLAND, on behalf of
himself and all others similarly situated,

Plaintiff,

- against -

GRAY MEDIA GROUP, INC.,

Defendant.

**ORDER**

22 Civ. 7539 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiff David McCausland alleges that Defendant Gray Media

Group, Inc. violated the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA" or the

"Act"), by sharing his personally identifiable information ("PII") with Facebook without

notification and without his consent.  (Am. Cmplt. (Dkt. No. 16) ¶¶ 3-4)  On April 20, 2023,

Defendant moved to dismiss the Amended Complaint pursuant to (1) Rule 12(b)(1) of the

Federal Rules of Civil Procedure for lack of standing; and (2) Rule 12(b)(6) for failure to state a

claim.  For the reasons stated below, Defendant's motion will be granted as to Rule 12(b)(6), and

the Amended Complaint will be dismissed.

## BACKGROUND

I.     **FACTS**

Defendant Gray Media is a media broadcasting company based in Atlanta,

Georgia, that owns and operates eleven websites offering news and video content, including

westernmassnews.com.  (Am. Cmplt. (Dkt. No. 16) ¶¶ 2, 8, 15-16)[1]

---

[1]  Prior to Gray Media's acquisition of the websites, they were owned and operated by Hawkeye
Acquisition, Inc. (f/k/a/ Meredith Corp.), KVVU Broadcasting Corporation, KPHO Broadcasting

Plaintiff David McCausland is a resident of Springfield, Massachusetts.  He "is a

subscriber of westernmassnews.com and watched videos on westernmassnews.com."  (Id. ¶ 7)

The Amended Complaint alleges that in order to subscribe to Defendant's

websites, including westernmassnews.com, individuals must provide their email address via a

webpage that resembles the following:



(Id. ¶ 19)  After subscribing to one of Defendant's websites, consumers "receive recurring

notifications and/or emails from Defendant with links to articles and videos published to the

respective [w]ebsite(s)."  (Id. ¶ 20)

---

Corporation, and KPTV-KPDX Broadcasting Corporation.  (Id. ¶ 9)  Those entities "merged
into" Gray Media on January 4, 2022, and Plaintiff alleges that Defendant is the "direct
successor" of those entities.  (Id. ¶¶ 9-10)  Defendant has not argued that it is not responsible for
conduct that took place prior to the January 4, 2022 merger.

The Amended Complaint further alleges that "Defendant monetizes its [w]ebsites by knowingly collecting and disclosing its subscribers' PII to Facebook, including data that personally identifies subscribers and the videos they view." (Id. ¶ 24)  To accomplish this objective, Defendant's websites "use a code analytics tool called 'Facebook Pixel,'" which "tracks the actions of [w]ebsite visitors," such as "subscribers" like Plaintiff.  The tracked actions include, inter alia, "the pages a visitor views and the content [a visitor] view[s]." (Id ¶¶ 25-26) When a subscriber "watches a video on one of Defendant's [w]ebsites," Facebook Pixel tracks the video name and the viewer's "Facebook ID" ("FID"), which is "uniquely associated with particular Facebook accounts, such that a[] FID can be used to identify and view the associated Facebook profile." (Id. ¶¶ 23, 27)  Facebook Pixel then "simultaneously sen[ds]" this information to Facebook.  (Id. ¶ 27)

In other words, when a subscriber "clicks on [an] article and watches [a] video" on one of Defendant's websites, "the viewer's FID . . . is sent to Facebook via Facebook Pixel." (Id. ¶ 29)  Facebook Pixel then "simultaneously discloses to Facebook the URL that a viewer has accessed . . . and [the] video name/content." (Id. ¶ 30)  And "[w]hen a URL, video name/content, and a[] FID are simultaneously disclosed, the video material accessed by a specific individual can be determined." (Id. ¶ 34)

Plaintiff alleges that he "has been a subscriber of Defendant's website, westernmassnews.com, since approximately 2016." (Id. ¶ 48)  He subscribed using his "personal email address." (Id. ¶ 50)  Plaintiff has also maintained a "Facebook account at all times since subscribing to westernmassnews.com," which he is "perpetually logged into." (Id. ¶ 49) Plaintiff's email address and his Facebook profile "contain his name, whereby Plaintiff can be personally identified by that information." (Id. ¶ 51)

Since subscribing to westernmassnews.com in 2016, Plaintiff has

regularly watched videos on westernmassnews.com using the same device and/or
browser in which he is logged into his Facebook account.

Each time Plaintiff watched a video on westernmassnews.com, Defendant
simultaneously disclosed Plaintiff's FID and the name of the video/content that he
viewed to Facebook via Facebook Pixel.

This paired information personally identifies Plaintiff and the video material that
he requested, obtained, accessed, and/or watched on westernmassnews.com.

(Id. ¶¶ 52-54)

Plaintiff alleges that he "did not consent to the disclosure of his PII"; that

Defendant "did not attempt to obtain Plaintiff's consent in a form separate and distinct from

other legal obligations"; and that Defendant "did not provide Plaintiff with an opportunity to

withdraw from the disclosure of his PII." (Id. ¶¶ 55-56)

## II.    PROCEDURAL HISTORY

The Complaint was filed on September 2, 2022 (Dkt. No. 1), and the Amended

Complaint was filed on November 3, 2022.  (Dkt. No. 16)  The Amended Complaint asserts that

Gray Media violated the VPPA by sharing Plaintiff's PII with Facebook via Facebook Pixel.  (Id.

¶¶ 69-77)

In a January 19, 2023 letter, Defendant advised that it anticipated filing a motion

to compel arbitration or to transfer the case to Iowa.  (Jan. 19, 2023 Def. Ltr. (Dkt. No. 31) at 2)

In a January 30, 2023 order, this Court directed the parties to engage in 45 days of discovery

regarding Defendant's anticipated motion.  (Dkt. No. 34)  That discovery encompassed, inter

alia, "the dates and times on which Plaintiff alleges that he accessed a video or videos on a

website controlled by Defendant, in connection with which Plaintiff's Facebook ID, the name of

the video, and the URL of the website were transmitted to Facebook."  (Id.)

4

In a March 23, 2023 letter – after the close of this discovery period – Defendant reported that it did not have "a strong basis to compel arbitration as to Plaintiff," but had concluded that Plaintiff "has suffered no injury and has no standing to assert a claim under the VPPA."  (Mar. 23, 2023 Def. Ltr. (Dkt. No. 36) at 1)

On April 20, 2023, Defendant moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of standing, and pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  (Dkt. No. 45)  Plaintiff filed an opposition brief on May 11, 2023 (Dkt. No. 48), and Defendant filed a reply on May 18, 2023.  (Dkt. No. 49)

## DISCUSSION

### I.      STANDING

Defendant argues that Plaintiff lacks Article III standing because "he has not been injured in any way recognizable under federal law."  (Def. Br. (Dkt. No. 47) at 5)  Plaintiff responds that he suffered a concrete injury as a result of Defendant's disclosure of his PII to Facebook.  (Pltf. Opp. (Dtk. No. 48) at 7-8)

#### A.      Legal Standards

##### 1.      Elements of Article III Standing

Because Article III "restricts federal courts to the resolution of cases and controversies," the party "invoking federal jurisdiction [must] have standing."  Davis v. Fed. Election Comm'n, 554 U.S. 724, 732 (2008).  "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise."  United States v. Suarez, 791 F.3d 363, 366 (2d Cir. 2015) (internal quotation marks and citation omitted).

To establish constitutional standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins,

578 U.S. 330, 338 (2016) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

Plaintiff bears the burden of establishing the elements of standing, and "at the pleading stage[]

the plaintiff must 'clearly . . . allege facts demonstrating' each element." Id. (quoting Warth v.

Seldin, 422 U.S. 490, 518 (1975)).

The requisite "injury in fact" is "an invasion of a legally protected interest which

is (a) concrete and particularized[;]. . . and (b) actual or imminent, not conjectural or

hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted).

However, "a plaintiff [does not] automatically satisf[y] the injury-in-fact requirement whenever a

statute grants a person a statutory right and purports to authorize that person to sue to vindicate

that right. Article III standing requires a concrete injury even in the context of a statutory

violation." Spokeo, 578 U.S. at 341.

Moreover, "[e]ven if Congress affords . . . plaintiffs a cause of action (with

statutory damages available) to sue over the defendant's legal violation," the concrete injury

must have a "close relationship to a harm traditionally recognized as providing a basis for a

lawsuit in American courts." TransUnion LLC v. Ramirez, 594 U.S. 413, 427, 440 (2021). The

"disclosure of private information" is such a harm. Id. at 425.

### 2.     Facial and Fact-Based Challenges to Standing

A defendant's Rule 12(b)(1) motion challenging plaintiff's "injury in fact" can be

facial or fact-based. "When a Rule 12(b)(1) motion is facial, i.e., based solely on the allegations

of the [pleading], the plaintiff has no evidentiary burden." Carter v. HealthPort Techs., LLC,

822 F.3d 47, 56 (2d Cir. 2016). In ruling on a facial challenge, "[t]he task of the district court is

to determine whether the [p]leading 'allege[s] facts that affirmatively and plausibly suggest that

6

[plaintiff] has standing to sue.'"  Id. (citing Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d

140, 145 (2d Cir. 2011)).

       "[A] defendant is [also] permitted to make a fact-based Rule 12(b)(1) motion,

proffering evidence beyond the [p]leading[s]."  Id. at 57.  "In opposition to such a motion, the

plaintiffs will need to come forward with evidence of their own to controvert that presented by

the defendant."  Id.  Plaintiffs have this burden where "'the affidavits submitted on a 12(b)(1)

motion . . . reveal the existence of factual problems' in the assertion of jurisdiction."  Id. (quoting

Exchange National Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1131 (2d Cir.

1976)).  "However, the plaintiffs are entitled to rely on the allegations in the [p]leading if the

evidence proffered by the defendant is immaterial because it does not contradict plausible

allegations that are themselves sufficient to show standing."  Id. at 57.  And "[i]f the extrinsic

evidence presented by the defendant is material and controverted, the district court will need to

make findings of fact in aid of its decision as to standing."  Id.

    **B.**    **Analysis**

       Here, Defendant's Rule 12(b)(1) motion constitutes a "fact-based" challenge to

Plaintiff's allegations asserting an injury in fact.  (See Def. Br. (Dkt. No. 47) at 9-13; Def. Reply

(Dkt. No. 49) at 6-9)  Defendant contends that the "discovery ordered by this Court" in

connection with Defendant's anticipated motion to compel arbitration demonstrates that

"Plaintiff cannot show (and no other records exist establishing) that he watched any video

content on Gray [Media's] websites, let alone that video-viewing information was transmitted to

Facebook."  (Def. Br. (Dkt. No. 47) at 5)

       In support of this argument, Defendant cites the following evidence:

    a declaration from William Gaffney, Defendant's Director of Digital Integrations and
       CTV Engineering, stating that Defendant "never used the Facebook pixel" after

Defendant "migrated the [westernmassnews.com] [w]ebsite to its platform" on February 28, 2022 (Lane Decl., Ex. A (Gaffney Decl.) (Dkt. No. 46-1) ¶ 20);

Plaintiff's browser history, which shows that Plaintiff visited pages on westermassnews.com as early as May 18, 2022,[2] but which does not indicate whether Plaintiff viewed videos on the website (Lane Decl., Ex. D (McCausland Browser History) (Dkt. No. 46-4) at 2);

Plaintiff's records from the "Off-Facebook activity" tool,[3] which show that Facebook received information about Plaintiff's "PAGE_VIEW[s]" on westermassnews.com between March 10, 2021 and February 25, 2022, but which do not reflect whether Facebook received information about videos that Plaintiff viewed (Lane Decl., Ex. E (McCausland Off-Facebook Activity Records) (Dkt. No. 46-5) at 4-10; Lane Decl. (Dkt. No. 46) ¶ 6);

Plaintiff's deposition testimony, in which he states that he "do[esn't] know" whether Defendant sent information about videos he viewed to Facebook (Lane Decl., Ex. C (Mar. 13, 2023 McCausland Dep. Tr.) (Dkt. No. 46-3) at 16:05-11); and

Gaffney's deposition testimony, in which he states that Defendant does not "keep any records of specific people, whether it's by user name, actual name, [or] Facebook I.D . . . [reflecting] who visits what pages." (Lane Decl., Ex. B (Mar. 15, 2023 Gaffney Dep. Tr.) (Dkt. No. 46-2) at 55:25-56:06)

As to Plaintiff's allegations, the Amended Complaint states that Plaintiff subscribed to westernmassnews.com in 2016 (Am. Cmplt. (Dkt. No. 16) ¶ 48); that "[s]ince becoming a subscriber" Plaintiff "regularly watched videos" on the website (id. ¶ 52); and that "[e]ach time [Plaintiff] watched a video" on the website during this period, Defendant "simultaneously disclosed Plaintiff's FID and the name of the video/content that he viewed to Facebook via Facebook Pixel." (Id. ¶ 53)  Plaintiff also testified at his deposition that he created

---

[2]  Although Defendant asserts that Plaintiff's browser history "only goes back to December 13, 2022" (Def. Br. (Dkt. No. 47) at 11), Defendant's browser history exhibit shows that Plaintiff visited pages on westernmassnews.com on May 18, 2022, August 9, 2022, and August 16, 2022. (Lane Decl., Ex. D (McCausland Browser History) (Dkt. No. 46-4) at 2)

[3]  The "Off-Facebook Activity" tool is a feature created by Facebook that allows a Facebook user to "[v]iew a summary of information Facebook receives about [the user's] activity on other apps and websites."  Off-Facebook Activity: Control Your Information, Facebook (last accessed Mar. 31, 2024), available at https://www.facebook.com/off-facebook-activity/.

a westernmassnews.com account "[within] the first couple weeks of January in 2016" (Lane

Decl., Ex. C (Mar. 13, 2023 McCausland Dep. Tr.) (Dkt. No. 46-3) at 11:15-16); that he

"watched numerous videos over the years" on the website (id. at 14:14); and that he specifically

recalled watching a video on westermassnews.com in "June of 2020," because the video

involved a story about "something [that] had happened to [his] roommate."  (Id. at 14:16-22)

        While Gray Media's Gaffney states in his declaration that Gray Media stopped

using Facebook Pixel on February 28, 2022, he also states that Defendant's websites, including

westernmassnews.com, "might have used" Facebook Pixel before that date.  (Lane Decl., Ex. A

(Gaffney Decl.) (Dkt. No. 46-1) ¶ 20)  And at his deposition, Gaffney testified that "[t]he

[Facebook] pixel would have been placed" on Defendant's websites "approximately within the

month of November[] 2018," and was not removed until February 28, 2022, after the websites

migrated to Defendant's platform.  (Lane Decl., Ex. B (Mar. 15, 2023 Gaffney Dep. Tr.) (Dkt.

No. 46-2) at 15:10-12, 62:04-08)  Accordingly, Gaffney's declaration and deposition testimony

indicate that Facebook Pixel – the alleged means by which Defendant transmitted Plaintiff's

personal information to Facebook – was operational on westernmassnews.com during the period

between November 2018 and February 2022, when Plaintiff testified that he recalled viewing

videos on the website.

        Given (1) Gaffney's testimony that Facebook Pixel "would have been placed" on

westernmassnews.com in approximately November 2018 and remained on the website until

February 2022; (2) Plaintiff's testimony that he viewed videos on westernmassnews.com during

this period; and (3) that it is undisputed that Facebook Pixel – if in use – would have transmitted

Plaintiff's personal information to Facebook after Plaintiff viewed a video on

westernmassnews.com, the evidence in the record is sufficient to demonstrate an injury in fact.

9

None of the remaining evidence cited by Defendant undermines this conclusion. Plaintiff's browser history and his "Off-Facebook Activity" records only cover the period from 2021 to 2022, and shed no light on Plaintiff's video viewing before then.  Plaintiff's deposition testimony that he "do[esn't] know" whether Defendant transmitted his personal information to Facebook is not probative, because there is no reason why Plaintiff would have personal knowledge of Defendant's business practices.  And Gaffney's testimony that Defendant keeps no records of "who visits what pages" on its websites does not address the transmission of PII over Facebook Pixel.

The Court concludes that Plaintiff has adequately alleged an injury from Defendant's unauthorized "disclosure of [his] private information" to Facebook, and that this alleged injury is sufficient to confer Article III standing.  TransUnion, 594 U.S. at 425; see Carter v. Scripps Networks, LLC, 670 F. Supp. 3d 90, 94-97 (S.D.N.Y. 2023) ("defendants' alleged disclosure of plaintiffs' personal information and viewing activities" to Facebook via Facebook Pixel "describes traditionally recognized harm" that is sufficient to confer Article III standing); Martin v. Meredith Corp., 657 F. Supp. 3d 277, 282-83 (S.D.N.Y. 2023) (same); Salazar v. Nat'l Basketball Ass'n, No. 1:22-CV-07935 (JLR), 2023 WL 5016968, at *4-7 (S.D.N.Y. Aug. 7, 2023) (same); Alex v. NFL Enterprises LLC, No. 1:22-CV-09239 (ALC), 2023 WL 6294260, at *2-3 (S.D.N.Y. Sept. 27, 2023) (same).

Accordingly, to the extent that Defendant's motion to dismiss is premised on an alleged lack of Article III standing, the motion will be denied.

## II.    FAILURE TO STATE A CLAIM

Defendant also moves to dismiss the Amended Complaint pursuant to Rule 12(b)(6) for failure to state a claim, arguing, inter alia, that Plaintiff has not plausibly alleged that he is a "consumer" within the meaning of the VPPA.  (Def. Br. (Dkt. No. 47) at 15)

A.      **Legal Standards**

1.      **Rule 12(b)(6) Standard**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp, v. Twombly, 550 U.S. 544,

570 (2007)).  "In considering a motion to dismiss . . . the court is to accept as true all facts

alleged in the complaint," Kassner v. 2nd Avenue Delicatessen Inc., 496 F.3d 229, 237 (2d Cir.

2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d

Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing

Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Under this standard, a plaintiff is required only to set forth a "short and plain

statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft 'to sho[w] that the

pleader is entitled to relief.'" Twombly, 550 U.S. at 557 (alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2)).  To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be

enough to raise a right of relief above the speculative level," id. at 555, and a plaintiff's claims

must be "plausible on [their] face." Id. at 570.  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

Id. (quoting Twombly, 550 U.S. at 557).  Moreover, where "the allegations in a complaint,

however true, could not raise a claim of entitlement to relief," Twombly, 550 U.S. at 558, or

where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[]

complaint must be dismissed." Id. at 570.  "Nor does a complaint suffice if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (alteration in original) (quoting Twombly, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers, 282 F.3d at 153; Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999))

### 2. The Video Privacy Protection Act

The VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1). The VPPA creates "'a private right of action for plaintiffs to sue persons who disclose information about their video-watching habits.'" Martin, 657 F. Supp. at 284 (quoting In re Nickelodeon Consumer Priv. Litig., 827 F.3d 262, 278 (3d Cir. 2016)).

"To state a claim under § 2710(b), 'a plaintiff must allege that (1) a defendant is a video tape service provider, (2) the defendant disclosed personally identifiable information concerning any consumer to any person, (3) the disclosure was made knowingly, and (4) the disclosure was not authorized' by another part of the statute." Martin, 657 F. Supp. at 284 (quoting Mollett v. Netflix, Inc., 795 F.3d 1062, 1066 (9th Cir. 2015)).

The Act defines the following relevant terms as follows:

(1) the term "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider;

. . .

(3) the term "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and

(4) the term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials.

18 U.S.C. §§ 2710(a)(1)-(4).

## B.   Analysis

Defendant argues that "Plaintiff is not a 'consumer' under the [Act]" because he has not plausibly alleged that he is a "renter, purchaser or subscriber." (Def. Br. (Dkt. No. 47) at 15)

The Amended Complaint does not allege that Plaintiff made payments to Defendant. Accordingly, Plaintiff cannot be a "renter" or "purchaser" under the VPPA. Plaintiff makes no argument to the contrary. (Pltf. Opp. (Dkt. No. 48) at 11-12, 14-15)

Plaintiff alleges that he is a "subscriber" under the VPPA, however, because he subscribed to westernmassnews.com using his personal email address. (Am. Cmplt. (Dkt. No. 16) ¶¶ 48, 50) To become a subscriber, Plaintiff typed his email address into a portion of Defendant's website that reads: "SIGN UP FOR WESTERN MASS NEWSLETTERS" and "subscribe to our free newsletters." (Id. ¶ 19) Plaintiff alleges that "[w]hen someone becomes a subscriber to Defendant's [w]ebsites, they receive recurring notifications and/or emails from Defendant with links to articles and videos published to the respective [w]ebsite(s)." (Id. ¶ 19-20)

The Amended Complaint does not allege, however, that Plaintiff's subscription to Defendant's newsletter granted him access to videos on Defendant's website that were not available to a non-subscribing website visitor. Accordingly, the question before the Court is whether someone who (1) inputs his email address on a company's website, and (2) receives a

13

free newsletter containing links to videos on the website that are generally accessible to other

website visitors, is a "subscriber" within the meaning of the VPPA.

With respect to VPPA claims related to newsletter subscriptions, the analysis of

Judge Castel in <u>Carter v. Scripps Networks, LLC</u>, 670 F. Supp. 3d 90, is instructive.  In that case,

> [t]he Complaint describes plaintiffs as subscribers of [the defendant's] newsletters, but does not … include facts that plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience. . . .
>
> The Complaint describes the newsletters as advertisements for [the website's] videos and articles.  Such newsletters are little different from any digital or analog subscription publication – whether a Substack email or a print edition of <u>New York</u> magazine – that includes advertisements for films or videos.
>
> Plaintiffs do not assert that they watched videos embedded in the newsletters themselves.  The newsletters may entice or encourage recipients to view [the website's] videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers.  Plaintiffs were free to watch or not watch [the website's] videos without any type of obligation, no different than any of the other 9.9 million monthly visitors to the site.

<u>Id.</u> at 99 (citation omitted).

Judge Castel concluded that such newsletter subscribers were not "subscribers"

within the meaning of the VPPA:

> In the statute's full context, a reasonable reader would understand the definition of "consumer" to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large.  The VPPA makes it unlawful for a "video tape service provider" to "knowingly disclose[ ], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1) (emphasis added).  A "video tape service provider" is defined as a person "engaged in the business . . . of rental, sale or delivery of prerecorded video cassette tapes or similar audio visual materials."  <u>Id.</u> § 2710(a)(4).  Thus, subsection (b)(1) provides a right of action to a "consumer" (<u>e.g.</u>, "renter, purchaser, or subscriber") of "such provider" (<u>e.g.</u>, one engaged in "the business . . . of rental, sale or delivery of . . . audio visual materials").  The definitions of "consumer" and "video tape service provider" are paired to some degree:  renter with rental, purchaser with sale, and subscriber with delivery, all of which subsection (a)(4) applies to audio visual materials.  Thus, the scope of a "consumer," when read with sections 2710(b)(1) and (a)(4), is cabined by the

definition of "video tape service provider," with its focus on the rental, sale or delivery of audio visual materials.  Section 2710(b)(1) provides for an action by a renter, purchaser of subscriber of audio visual materials, and not a broader category of consumers.

Id. at *98-99.

This Court agrees with Judge Castel's analysis in Carter.  When "interpreting a statute, . . . courts are not to 'construe each phrase literally or in isolation,' [and instead] must 'attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole.'"  Federal Housing Finance Agency v. UBS Americas Inc., 712 F.3d 136, 141 (2d Cir. 2013) (quoting Pettus v. Morgenthau, 554 F.3d 293, 297 (2d Cir. 2009).  A reasonable reader of the VPPA would understand the reference to "goods or services from a video tape service provider" in the statute's definition of "consumer" to refer to "audio-visual materials," not "goods or services writ large."

In adopting Judge Castel's reasoning, this Court joins several other courts in this District that have cited Carter with approval when addressing VPPA claims brought by newsletter subscribers.  See Salazar, 2023 WL 5016968, at *9 ("[T]he Court agrees with the Carter court's analysis that reviewed a . . . newsletter arrangement with a website."); Alex, 2023 WL 6294260, at *3-4 (same); Golden v. NBCUniversal Media, LLC, No. 22 CIV. 9858 (PAE), 2023 WL 5434378, at *9-11 (S.D.N.Y. Aug. 23, 2023) (same); Lamb v. Forbes Media LLC, No. 22-CV-06319-ALC, 2023 WL 6318033, at *12 (S.D.N.Y. Sept. 28, 2023) (same); see also Salazar v. Paramount Glob., No. 3:22-CV-00756, 2023 WL 4611819, at *11 (M.D. Tenn. July 18, 2023) ("The Court agrees with and incorporates the statutory interpretation of the court in Carter."); Gardener v. MeTV, No. 22 CV 5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023) ("The Carter plaintiffs are indistinguishable from the Plaintiffs here:  both had subscriptions

15

(newsletter or website) of a kind that were unconnected to their ability to access video content.").[4]

Because Plaintiff has not adequately alleged that he qualifies as a "consumer" within the meaning of the VPPA, Defendant's motion to dismiss will be granted.

### CONCLUSION

For the reasons stated above, Defendant's motion to dismiss (Dkt. No. 45) is granted pursuant to Rule 12(b)(6) for failure to state a claim.

While the Court grants leave to move to amend, in any such motion, Plaintiff will explain in detail how each defect cited in this Order has been satisfied by factual allegations in the proposed second amended complaint.  The proposed second amended complaint is to be attached as an exhibit to the motion.  Any motion for leave to amend is to be filed by **April 15, 2024**.

The Clerk of Court is directed to terminate the motion (Dkt. No. 45).

Dated: New York, New York
       March 31, 2024

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[4]  Lebakken v. WebMD, LLC, 640 F. Supp. 3d 1335, 1341 (N.D. Ga. 2022) – cited by Plaintiff (Pltf. Opp. (Dkt. No. 48) at 11) – is not persuasive.  Although the Lebakken court concluded that an "e-newsletter constitutes a good or service" under the VPPA, the court did not adequately consider the VPAA's focus on audio-visual materials.  See Salazar, 2023 WL 5016968, at *10 n.3 (declining to follow Lebakken "because its subscribership analysis was not sufficiently tethered to video services").